# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GLENN BURTON, JR.,
    Plaintiff,

    v.                                                Case No. 07-CV-0303

AMERICAN CYANAMID et al.,
    Defendants;

RAVON OWENS,
    Plaintiff,

    v.                                                Case No. 07-CV-0441

AMERICAN CYANAMID et al.,
    Defendants;

CESAR SIFUENTES,
    Plaintiff,

    v.                                                Case No. 10-CV-0075

AMERICAN CYANAMID et al.,
    Defendants.

## DECISION AND ORDER

These cases come before me on plaintiffs' motion for summary judgment on the question whether defendant Armstrong Containers, Inc. ("ARCO") is successor-in-interest to the John R. MacGregor Lead Company ("MacGregor"). In addition, plaintiffs allege that ARCO filed a brief opposing plaintiffs' motion while withholding certain evidence probative of the motion's merits, in violation of Fed.R.Civ.P. 11(b)(4). Plaintiffs request that I consider sanctions against ARCO for this alleged violation under my

Fed.R.Civ.P. 11(c)(3) authority. (E.g., No. 07-CV-0303, ECF No. 1034). I will address plaintiffs' request in this decision and order.

## I. BACKGROUND

The briefing of this successorship issue requires some unpacking. In their initial motion for summary judgment, plaintiffs presented this theory of successorship: In June of 1971, MacGregor changed its name to LMC, Inc. The following December of 1971, Armstrong Chemcon and LMC, Inc. merged, and the surviving corporation was Armstrong Chemcon, a Delaware Corporation. Plaintiffs argue that, because this merger did not make any explicit provision or arrangement as to LMC's liabilities, Armstrong Chemcon as the surviving business entity was subject to those liabilities under both Wisconsin and Delaware law. Then, in 1975, Armstrong Chemcon changed its name to Armstrong Containers, Inc, a Delaware corporation. Plaintiffs assumed that this Armstrong Containers, Inc. was the same entity as the defendant Armstrong Containers, Inc. in the present lawsuit, and concluded that therefore the defendant Armstrong Containers is answerable for the liabilities incurred by MacGregor Lead.

ARCO filed a response brief, in which it stated that it did not dispute "the general proposition that the surviving entity resulting from a merger may succeed to the liabilities of the pre-merger entities in the absence of an express arrangement for those liabilities." (No. 07-CV-0303, ECF No. 832 at 6-7). ARCO also stated that it did not dispute (1) that MacGregor changed its name to LMC in 1971; (2) that LMC merged with Armstrong Chemcon, a Delaware Corporation; or (3) that Armstrong Chemcon changed its name to Armstrong Containers in 1975. (*Id.* at 2). However, ARCO asserted that this Armstrong

Containers is not the same entity as the Armstrong Containers, Inc. that is a defendant in the present case. ARCO set forth certain new facts, as follows.

> In 1983, Armstrong Chemcon[1] changed its name from Armstrong Containers, Inc. to Armstrong Leasing, Inc.
> On March 18, 1986, Armstrong Industries, Inc. was formed. In 1993, Armstrong Industries adopted the name Armstrong Containers, Inc., a Delaware corporation—the defendant in this litigation.
> In sum, *defendant* Armstrong was not in existence until 1986 and was not called "Armstrong Containers, Inc." until 1993.

*Id.* at 2-3, (internal citations omitted).

Plaintiffs then contracted with a private investigator to investigate defendant Armstrong's corporate history. (No. 07-CV-0303, ECF No. 1034 at 2). The investigators reviewed proceedings in related cases and located an affidavit that Robert P. Alpert, counsel for Armstrong Containers in the present litigation and author of the brief-in-opposition to the motion now at issue, had authored in the course of representing Armstrong in another Wisconsin lead paint personal injury case. The affidavit chronicles the corporate history of Armstrong and shows that the Armstrong Containers that changed its name to Armstrong Leasing in 1983 is perhaps not so entirely unrelated from the defendant Armstrong Containers in the present litigation as the brief-in-opposition might seem to suggest. Specifically, the Alpert affidavit details this series of corporate transactions:

> 15. On June 30, 1971, MacGregor changed its name to LMC, Inc.
>
> 16. On December 15, 1971, LMC, Inc. merged into its parent corporation, Armstrong Chemcon, a Delaware corporation.

---

[1] I.e., the entity into which LMC (formerly known as MacGregor Lead) had merged.

17. Armstrong Chemcon later changed its name to Armstrong Containers, Inc., a Delaware corporation, on or about December 31, 1974.

18. On June 16, 1983, Armstrong Containers, Inc., a Delaware corporation, entered into an Assets Purchase Agreement with Newarmco, Inc., an Illinois corporation ("Newarmco").[2] The Assets Purchase Agreement provides, among other things, that Newarmco acquired certain of Armstrong Containers, Inc.'s assets and liabilities.

19. On June 28, 1983, Newarmco changed its name to Armstrong Containers, Inc., an Illinois corporation.

20. On March 18, 1986, Armstrong Industries, Inc., a Delaware corporation ("Industries") was formed.

21. In 1986, Industries acquired Armstrong Containers, Inc., an Illinois corporation, through a series of transactions.

22. In 1993, Armstrong Containers, Inc., an Illinois corporation, was merged into Industries. The surviving entity was re-named Armstrong Containers, Inc., a Delaware corporation. It is this Armstrong Containers, Inc., that is a Defendant in this action.

No. 07-CV-0303, ECF No. 1035-2 at ¶¶ 15-22 (internal citations omitted).

Plaintiffs noted in their reply brief that, whereas Armstrong's response to plaintiffs' motion had characterized the 1993 transaction as a name change, the Alpert affidavit identifies it as a merger between Armstrong Containers, Inc. (an Illinois Corporation) and Armstrong Industries, Inc. (a Delaware Corporation) that resulted in a company named Armstrong Containers, Inc., a Delaware Corporation and the defendant in the Wisconsin lead paint cases. This characterization is supported by the Certificate of Merger

---

[2] According to an exhibit submitted by Armstrong Containers in its response to Plaintiffs' motion, the amendment of the certificate of incorporation changing Armstrong Containers, Inc., to Armstrong Leasing, Inc., was then filed the next day, on June 17,1983. No. 07-CV-0303, ECF No. 835-3.

4

associated with the transaction, which plaintiffs filed as an exhibit to their reply brief. Further, plaintiffs noted that the merger agreement contained no language providing for liabilities; therefore, they argued, the surviving corporation (i.e., the defendant Armstrong Containers) is answerable for the liabilities of the Illinois corporation that merged into it.

Because plaintiffs' reply brief relied on new materials and made new arguments, I permitted Armstrong to file a sur-reply. Armstrong did not contest plaintiffs' characterization of the 1993 merger. Instead, Armstrong focused on the June 16, 1983 Assets Purchase Agreement in which Newarmco, an Illinois corporation, acquired certain assets and liabilities of Armstrong Containers, the Delaware Corporation into which MacGregor Lead (a.k.a. LMC) had merged in 1971. Armstrong argued that the language of the Asset Purchase Agreement is such that Newarmco did not assume any of the liabilities at issue in this case---meaning that it could not have passed any liabilities on to the defendant through the 1993 merger.

Finally, to ensure complete briefing, I permitted plaintiffs to file a sur-sur-reply presenting their analysis of the Newarmco Asset Purchase Agreement. They did so, arguing that the Agreement did effectuate a transfer to Newarmco of the relevant liabilities.

The upshot of this briefing history is that resolution of plaintiffs' motion for partial summary judgment will hinge on the proper interpretation of the 1983 Newarmco asset purchase agreement. Armstrong has had opportunities to contest plaintiffs' characterization of both the 1971 merger and the 1993 merger and has declined to take them, effectively waiving those arguments. *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996).

The parties agree that the language pertinent to the transfer of liabilities between the first Armstrong Containers and Newarmco is contained in Paragraph 8 of the Assets Purchase Agreement. It reads, in relevant part, as follows.

> 8. As of the Closing New Corporation[3] agrees to assume, discharge and pay in accordance with their respective terms and obligations and to be responsible for the liabilities and obligations of Sellers as of the Closing Date set forth below . . . :
>
> …
>
> (i) Obligations with respect to litigation and claims against Sellers other than litigation and claims involving or arising out of liabilities and obligations expressly not assumed by New Corporation pursuant to Paragraph 9 of this agreement.
>
> (j) Except for the obligations and liabilities referred to in paragraph 9 below, and with the exceptions referred to in this paragraph 8 and paragraph 23 below, New Corporation shall assume all other obligations of sellers, whether accrued, contingent or future, based on, related to or arising out of events or occurrences prior to the closing, whether known or unknown and regardless of when arising or asserted.

## II.    LEGAL ANALYSIS

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

To resolve the issue now before me, I must interpret the 1983 Assets Purchase Agreement and determine whether it effectuated a transfer of the sort of liability at issue in this case (i.e., liability for a tort claim for which the alleged culpable conduct occurred

---

[3] I.e., Newarmco.

6

before the execution of the Agreement, but for which the actual injury arose several years after the execution of the Agreement). As a federal court sitting in diversity, I apply state substantive law and federal procedural law. *Camp v. TNT Logistics Corp,* 553 F.3d 502, 505 (7th Cir. 2009). Because none of the parties have raised the choice of law issue, I will apply the substantive law of Wisconsin, the forum state. *Id.* Therefore, I begin my analysis with a survey of the relevant principles of contract interpretation under Wisconsin law.

My goal in interpreting a contract is to give effect to the parties' intentions. *Ash Park LLC v. Alexander and Bishop Ltd.*, 363 Wis. 2d 699, 712 (2015). I am to "presume the parties' intent is evidenced by the words they choose, if those words are unambiguous." *Id.* "When the terms of a contract are ambiguous, however, evidence extrinsic to the contract itself may be used to determine the parties' intent." *Id.* at 713. Specifically, when interpreting an ambiguous contract provision, I "must reject a construction that renders an unfair or unreasonable result." *Gottsacker v. Monier,* 281 Wis.2d 361, 375 (2005) (internal citations omitted). Likewise, I "should adopt a construction that will render the contract a rational business instrument so far as reasonably practicable." *Id.* A contract provision is ambiguous if it is fairly susceptible of more than one interpretation. *Ash Park*, 363 Wis. 2d at 713.

Furthermore, I am to construe contract language according to its plain or ordinary meaning. *Id.* If a contract term is undefined, the contract should be considered as a whole. *MS Real Estate Holdings, LLC v. Donald P. Fox Family Trust*, 362 Wis. 2d 258 (2015). "Interpretations that give reasonable meaning to each provision in the contract

are preferred over interpretations that render a portion of the contract superfluous." *Ash Park*, 363 Wis. 2d at 713.

Under Subparagraph 8(i) of the Assets Purchase Agreement, Newarmco assumes "obligations with respect to litigation and claims against sellers." The word "obligations" is not defined in the contract, and its meaning and scope in the context of ¶ 8(i) is not self-evident. The word might be read broadly such that liability for unknown and contingent personal injury claims falls under its umbrella; it might also be read narrowly as denoting a category of obligation distinct from legal liability (a reading supported to some extent by the recurrence of the phrase "liabilities and obligations" throughout Paragraph 8, which suggests that the words have different meanings but offers no final clarity as to the meaning of "obligations"). Because the word "obligations" is undefined, I will attempt to discern its meaning by considering the contract as a whole.

Paragraph 8 is structured as a broad transfer of "liabilities and obligations," subject to certain exclusions. The initial, "umbrella" paragraph announces Newarmco's intent "to assume . . . and be responsible for the liabilities and obligations of Sellers as of the Closing Date set forth below." Subparagraphs (a)-(i) then "set forth" various categories of obligations and liabilities that Newarmco agrees to assume, subject to certain precisely delineated exceptions.[4] Holding to this pattern, subparagraph 8(i)

---

[4] For example:

> (b) Sellers' obligations regarding employee compensation (**other than** obligations with respect to or arising out of the Armstrong Containers, Inc. Employees Retirement Income Plan and related Trust claims of employees for workers compensation benefits resulting from accidents or occurrences prior to the Closing and employees claims under Sellers' group medical plan for employees made in writing within 60 days following the closing with respect to events and occurrences prior to the closing claims under Sellers' group medical plan by employers receiving benefits under the Armstrong Containers, Inc. Employers Retirement Income Plan as of the Closing Date), whether accrued,

announces Newarmco's assumption of "obligations with respect to litigation and claims against Sellers other than litigation and claims involving or arising out of liabilities and obligations expressly not assumed by New Corporation pursuant to Paragraph 9 of this agreement." (Paragraph 9 is a failsafe provision that prevents Newarmco from assuming liabilities or obligations in a manner that might disrupt insurance coverage; it is not relevant here.) Finally, ¶ 8(j) is a catchall that again states Newarmco's intention to "assume all other obligations of Sellers, whether accrued, contingent or future, based on, related to or arising out of events or occurrences prior to the closing, whether known or unknown and regardless of when arising or asserted," subject only to narrow exclusions clearly delineated elsewhere in ¶ 8 or at other points in the contract. Because ¶ 8 clearly indicates that the parties intent is a broad, inclusive transfer of liabilities and obligations, I conclude that the term "obligations" in ¶ 8(i) is to be construed broadly. *Cf. Columbia Propane L.P. v. Wisconsin Gas Co.,* 261 Wis.2d 70, 88-89 (2003) (asset transfer agreement was broadly structured to *exclude* liabilities and allow assumption of only certain narrowly defined liabilities, so that narrow construction of the transferred liabilities was appropriate).

---

contingent or arising as a result of this Agreement, including but not limited to, salaries, wages, sick leave, holiday pay, pension obligations with respect to the multiemployer plans referred to in Paragraph 25(b), below, overtime pay, vacation pay, disability, and unemployment, including state, federal and local taxes based thereon;

(c) **Excluding the exceptions** referred to in Paragraph 8(b), **all liability** for sellers' obligations, whether accrued, contingent or future, known or unknown and regardless of when arising or asserted, to any employee of Sellers with respect to litigation or claims before any court . . . ;

…

(e) Sellers' obligations for other accrued liabilities, **excluding** obligations for contributions to the Armstrong Containers, Inc. Employees Retirement Income Plan, as recorded on Sellers respective financial statements;

(f) Sellers' obligations for accrued taxes **other than** state and federal income and franchise taxes . . . .

(Emphasis supplied).

The overall document is less helpful when it comes to distinguishing the meaning of "obligations" from the meaning of "liabilities." Subparagraph 8(c) includes the language "all **liability** for Sellers' **obligations** . . . to any employee of sellers with respect to litigation or claims…." Subparagraph 8(e) refers to "sellers' **obligations** for other accrued **liabilities**, excluding **obligations** for contributions to [a retirement plan]." So: obligations can give rise to liabilities, but liabilities can also give rise to obligations.

Then, ¶ 8(i) announces that Newarmco will assume "**obligations** with respect to litigation and claims against sellers other than litigation and claims involving or arising out of **liabilities** and **obligations**" excluded under ¶ 9. So: obligations can arise from litigation and claims, but litigation and claims can also involve or arise from both liabilities and obligations.

Finally, ¶ 8(j) states that "except for the **obligations** and **liabilities** referred to in Paragraph 9 below, New Corporation shall assume all other **obligations** of Sellers…" This sentence suggests that, when used broadly, "obligations" is a general category that can include both more narrowly-defined obligations and more narrowly-defined liabilities.

All of this means that I am unwilling to accept Armstrong's argument that the parties use of the term "obligations" in ¶ 8(i) reveals an intent to *exclude* liabilities for legal claims against the sellers from the transaction. Instead, the meaning of the term "obligations" as used in the contract is ambiguous, meaning that it is capable of more than one reasonable interpretation. It could be a broad category inclusive of liabilities for legal claims; it could be a more narrow category of obligations that may be related to or coexist with legal claims, but that are not the same thing.

Because the term "obligations" remains ambiguous, I will apply the principle that I "should adopt a construction that will render the contract a rational business instrument so far as reasonably practicable." *Gottsacker v. Monier,* 281 Wis.2d at 375. Armstrong argues that, by using only the term "obligations" in ¶ 8(i), Newarmco only assumed litigation "obligations" such as defense costs and expenses, and did not assume responsibility for any resulting "liabilities" such as judgments. Such a contract would not be a "rational business instrument." I find it incredible that a reasonable business would contract to pay to defend against claims for which it would not, itself, bear ultimate responsibility. The reasonable interpretation of ¶ 8(i) is that Newarmco agreed to bear responsibility both for the costs of defending claims against the sellers, and for any "obligations" (i.e., judgments) that might arise from those claims.

Thus, I conclude that the defendant Armstrong Containers, Inc. is successor-in-interest to MagGregor Lead. I will grant plaintiffs' motions for summary judgment.

### III. SANCTIONS

Plaintiffs have asked that I consider using my Rule 11(c)(3) authority to sanction ARCO for its response brief, which argued that the Armstrong Containers, Inc. into which MacGregor Lead merged in 1971 was a different entity from the defendant Armstrong Containers, but did not acknowledge what it knew of the series of transactions linking those two organizations. I agree with plaintiffs that greater transparency by Armstrong would have yielded a more efficient (and, for plaintiffs, inexpensive) resolution of the issue on its merits. However, ARCO's approach to the response brief was not inappropriate given the limited arguments presented by plaintiffs in their opening brief. ARCO's task was only to demonstrate that Plaintiffs had not, at that stage, adduced

11

evidence sufficient to establish its successorship as a matter of law. I will not initiate Rule 11(c)(3) sanctions against ARCO on these grounds.

**IT IS ORDERED** that plaintiffs motions for summary judgment on this issue of ARCO being successor-in-interest to the MacGregor Lead Company (No. 07-C-0303, # 629; No. 07-C-0441, # 562 ; No. 10-C-0075, # 503 ) are **GRANTED**.

Dated in Milwaukee, Wisconsin, this 2nd day of November, 2018.

                                                  s/Lynn Adelman_____
                                                  LYNN ADELMAN
                                                  United States District Judge